**Dolores DIXON, Executrix of the Estate of Thomas Dixon, Deceased; and Masaji Toki, Plaintiffs–Appellants,**

v.

**Thomas ANDERSON, William McLaughlin, C.J. Grothaus, Henry Helling and R.O. Huffman, Defendants–Appellees.**

No. 90–3126.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 11, 1990.

Decided March 21, 1991.

Rehearing and Rehearing En Banc Denied May 7, 1991.

Paul H. Tobias (argued), Tobias & Kraus, Cincinnati, Ohio, for plaintiffs-appellants.

Patrick A. Devine (argued), Theresa Rittinger Schaefer, Office of Atty. Gen. of Ohio, Columbus, Ohio, for defendants-appellees.

Before JONES and RYAN, Circuit Judges, and WISEMAN, Chief District Judge.*

RYAN, Circuit Judge.

In this civil rights action brought under 42 U.S.C. § 1983, an Ohio state employee and a deceased Ohio state employee's executrix appeal the district court's summary judgment in favor of defendants, who are directors of state retirement programs. The only issue on appeal is whether, as the district court held, plaintiffs brought their action after expiration of the relevant limitations period. We conclude that they did so, and now affirm.

I.

Except as otherwise noted, the parties have stipulated to the facts as follows.

## A. The State Retirement Systems

In Ohio, every employee of state or local government may become a member of the state retirement system that covers the employee's branch of public service. Each of the state's six retirement systems is a defined benefits plan, which means that a member employee has a vested right to receive a certain level of retirement benefits without regard to the amount of money he or she has paid into the system in the way of pension benefits contributions. After retirement, the employee continues to receive benefits even if the employee "outlives" his or her life expectancy.

Members of a particular retirement system contribute a certain portion of their salaries to that system. The members' employers withhold these contributions from the members' payroll checks and pay them into "employees' savings funds." "These contributions are credited to the individual member and may be withdrawn by that member if he or she leaves Ohio state employment."

State employers also contribute to the appropriate state retirement systems on behalf of employees. The amount contributed is a percentage of the total earnable salary of all members of an Ohio state retirement system. This money goes into a general "employers' trust fund," does not stand to the credit of an individual member, and stays in the fund even as individual members exit the system. The employer percentage varies annually according to the actuarially computed needs of the particular retirement system, but the employer percentage is applied uniformly without regard to the particular employer's characteristics or its history.

According to the stipulated facts, the retirement systems operate as follows:

> At the beginning of the benefit, the member's individual accumulated account in the employee's trust [savings] fund is transferred to the pension reserve fund. The difference between the member's account and the reserve necessary to guarantee payment [according to

* The Honorable Thomas A. Wiseman, Jr., Chief Judge of the United States District Court for the

Middle District of Tennessee, sitting by designation.

actuarial calculations] is transferred from the employer's trust fund. If, at any time, there are insufficient assets in the annuity and pension fund and the guarantee fund, then the amount of such deficiency must be paid by an additional employer rate of contribution assessed against all employers or by direct appropriation from the State Treasury.

Employees who have been members of more than one Ohio public retirement system may be able to "combine service credit under one system or coordinate retirements by various methods set forth by statute." However, all the systems and employers must adhere to Ohio Rev.Code Ann. § 124.85 (Anderson 1990), Ohio's "double-dipping" statute.[1] Under this statute, once a system member begins *receiving* retirement benefits from one system, he or she may not then become or remain a member of a different retirement system. The fact that an employee is receiving retirement benefits from a source other than an Ohio public retirement system is no bar to membership in an Ohio public retirement system.

### B. Plaintiff's Decedent Dixon

On August 27, 1975, Thomas Dixon left his job with the Cincinnati Police Division, where he had accumulated a number of years of "service credit" with the Police and Fire Disability Pension Fund ("PFDPF"). In September 1976, he started work for the Cincinnati Board of Education. The clerk-treasurer for the Cincinnati Public Schools informed Dixon that if he began receiving benefits from the PFDPF system, he would not be eligible for membership in the School Employees Retirement System (SERS). Nevertheless, Dixon thereafter applied for membership in SERS, and his employer deducted SERS contributions from Dixon's payroll check for September, October, and November of 1976.

On November 10, 1976, Dixon retired from PFDPF and began receiving benefits from that plan. At that point, SERS refunded the contributions Dixon had made to that plan and, pursuant to Ohio Rev. Code Ann. § 124.85 (Anderson 1990), refused to allow Dixon to become a SERS member. Had Dixon chosen to postpone retiring from PFDPF until he retired from the Board of Education, he would have been required to join SERS and could have "coordinated" retirement benefits from both SERS and PFDPF.

Until his recent death, Dixon continued to receive benefits from PFDPF. His employer deducted no retirement contributions from his paycheck, and Dixon received no service credit toward retirement for his work for the Board of Education.[2]

### C. Plaintiff Toki

On April 1, 1978, Plaintiff Masaji Toki left his job with the Cincinnati Regional Crime Information Center. Through that job, Toki had accumulated some service credit toward retirement with the City of Cincinnati Retirement System ("CCRS"). Also on April 1, 1978, Toki began working for the Cincinnati Board of Education. Through his interview for this latter position in March 1978, Toki learned that he would not be eligible for membership in SERS while he received retirement benefits from another state retirement system. Nevertheless on April 1, 1978, he retired from CCRS and began receiving benefits.

1. The statute reads:

No person who is receiving a disability benefit or service retirement pension or allowance from any state or municipal public retirement system in Ohio, shall be eligible for membership in any other state or municipal retirement system of this state. This section shall in no way affect the receipt of benefits by or eligibility for benefits of any person who is already receiving a disability benefit or service retirement pension or allowance from a state or municipal public retirement system in Ohio and is a member of any state or municipal retirement system of this state on the effective date of this section.

2. The stipulated facts presented to us do not mention a later attempt by Dixon to join SERS. However, evidence indicates that on October 29, 1987, SERS personnel responded to an inquiry from Dixon by confirming that section 124.85 prohibited him from joining SERS.

Thus, he was not eligible for membership in SERS.[3]

### D. The Litigation

On September 29, 1988, Dixon and Toki filed a complaint on behalf of themselves and a class composed of certain other state employees against the defendants who are the executive directors of five of the six Ohio state retirement systems, under 42 U.S.C. § 1983. Plaintiffs alleged that the directors of the retirement systems, under color of state law, denied plaintiffs pension system participation in violation of the fourteenth amendment right to equal protection of the laws. The complaint alleged a violation of equal protection on the grounds that while SERS denied plaintiffs membership in a state retirement system, SERS allowed "similarly situated" state employees[4] not already receiving Ohio state pensions to join.

Both parties moved for summary judgment. Defendants argued, among other things, that the statute of limitations barred plaintiffs' claim. The district court granted defendants' motion for summary judgment on that ground. 727 F.Supp. 1124. Plaintiffs appealed. During the pendency of this appeal, Thomas Dixon died, and his executrix was substituted as a party plaintiff pursuant to Fed.R.App.P. 43(a).

### II.

■ In section 1983 actions, the appropriate statute of limitations is the analogous state statute of limitations for personal injury actions. *Wilson v. Garcia,* 471 U.S. 261, 276–80, 105 S.Ct. 1938, 1947–49, 85 L.Ed.2d 254 (1985). In Ohio, the two-year limitations period of Ohio Rev.Code Ann. § 2305.10 (Anderson 1981) governs. *Browning v. Pendleton,* 869 F.2d 989 (6th Cir.1989).

■ In determining when the statute of limitations begins to run, that is, when the cause of action accrues, we follow federal law. *Sevier v. Turner,* 742 F.2d 262, 272 (6th Cir.1984). "The statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action. A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Id.* at 273 (citations omitted). In determining when the cause of action accrues in section 1983 actions, we have looked to what event should have alerted the typical lay person to protect his or her rights. *Conlin v. Blanchard,* 890 F.2d 811, 815 (6th Cir. 1989).

■ Dixon and Toki had reason to know of their injuries when their new employer both informed them of Ohio Rev.Code Ann. § 124.85's prohibition against "double-dipping" and refused to allow them to join SERS. Since these events occurred well outside the two-year limitations period, it might seem a straightforward conclusion that plaintiffs' claims are time-barred. Indeed, defendants contend that this conclusion ends the matter. In their view, no events operate to extend the original limitations period or to trigger the running of a new one.

However, plaintiffs now argue on appeal that their case falls under the "continuing violation" doctrine, which would allow plaintiffs to bring their claim within two years of the most recent of any discrete acts of discrimination against them. Dixon and Toki claim such a discrete act occurred when SERS last responded to their requests for membership, in 1987 and 1988, respectively. Alternatively, plaintiffs seem to claim that under the continuing violation doctrine, they may bring an action at any time, so long as the allegedly discriminatory statutory policy against double-dipping remains in effect. Before the district court, plaintiffs mentioned the possibility of a continuing violation only briefly in

---

**3.** The stipulated facts do not mention Toki's other attempts, if any, to join SERS. However, evidence indicates that SERS responded negatively in November 1988 to a verbal inquiry or demand by Toki.

**4.** Apparently, the "similarly situated" employees were those employees receiving pensions from sources other than the state of Ohio.

passing, with the result that the court omitted all reference to such contentions from its opinion. However, we have decided that despite this unfortunate posture, we shall address plaintiff's contentions with respect to this issue.

Our policy of measuring the limitations period beginning only from the time when the plaintiff knew or should have known of the injury sometimes is counted as one aspect of continuing violation theory. *Stewart v. CPC International, Inc.*, 679 F.2d 117, 120 (7th Cir.1982); *Conlin*, 890 F.2d at 815. More typically, however, courts view "continuing violations" as falling into two categories of "narrowly limited exceptions" to the usual rule that "statutes of limitations ... are triggered at the time the alleged discriminatory act occurred." *E.E.O.C. v. Penton Industrial Pub. Co., Inc.*, 851 F.2d 835, 837–38 (6th Cir.1988). Because the facts are stipulated, our only task is to determine, as a matter of law,[5] whether Dixon's and Toki's situation falls into either of the two categories.

### A. The First Category

■ "The first category [of continuing violation] arises where there is some evidence of *present* discriminatory activity giving rise to a claim of a continuing violation; that is, where an employer continues presently to impose disparate work assignments or pay rates between similarly situated employee groups." *Id.* at 838 (emphasis in original). The rationale underlying this category is that the employer commits an illegal act, such as giving unequal pay for equal work, *each time* the employer dispenses the unequal pay. *Hall v. Ledex,*

*Inc.*, 669 F.2d 397, 398 (6th Cir.1982). This result follows from the fact that paying unequal wages for equal work is *in itself* the forbidden discriminatory act. It is irrelevant that the employer has committed the same illegal act at other times prior to the beginning of the relevant limitations period. *See Bazemore v. Friday*, 478 U.S. 385, 394–95, 106 S.Ct. 3000, 3005–06, 92 L.Ed.2d 315 (1986). Of course, this category requires a "current" as well as "continuing" violation: at least one of the forbidden discriminatory acts must have occurred within the relevant limitations period. *Id.* Thus limitations periods begin to run in response to discriminatory *acts* themselves, not in response to the continuing *effects* of past discriminatory acts. *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980); *United Airlines v. Evans*, 431 U.S. 553, 557, 97 S.Ct. 1885, 1888, 52 L.Ed.2d 571 (1977).

The distinction between continuing effects and continually recurring violations can be subtle. Plaintiffs Dixon and Toki argue that new violations occur daily whenever Dixon's and Toki's allegedly "similarly situated" colleagues enjoy membership in SERS and have employee contributions recurringly withheld from their checks. In fact, however, Dixon and Toki suffer only the continuing *effects* of past discrimination and are not the victims of a continuing *violation*. It is not in itself a civil rights violation to treat two employees differently where one is a member of a retirement system and the other is not. Once the division into members and nonmembers has been made according to statute, the system operates neutrally. All members are treated equally, and all *non* members are treat-

---

**5.** Summary judgment is appropriate where no genuine issue of material fact exists so that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court determines whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Of course, "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88,

106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). The movant meets its initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). At that point, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

ed equally. The Supreme Court has held that a neutral system that merely perpetuates the effects of previous discrimination is not a continuing violation. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 560–61, 97 S.Ct. 1885, 1890–91, 52 L.Ed.2d 571 (1977).

The employer's failure to withhold contributions from Dixon's and Toki's checks is a mere reminder of their nonmember status. They are disadvantaged not because their employer does not withhold employee retirement contributions from each check but because they will receive no benefits from SERS when they retire. They will receive no benefits solely because of the initial determinations that they are not eligible for SERS membership. Thus, at least as far as this first category of continuing violation is concerned, the limitations period for plaintiffs' cause of action was triggered when they learned of their classification as nonmembers, and there were no later triggering events.

### B. The Second Category

 The second category of "continuing violation" arises where there has occurred "a longstanding and demonstrable policy of discrimination." *Penton*, 851 F.2d at 838. Unrelated incidents of discrimination will not suffice to invoke this exception; rather, there must be a continuing "over-arching policy of discrimination." *Janikowski v. Bendix Corp.*, 823 F.2d 945, 948 (6th Cir.1987). Generally, "[r]epeated requests for further relief from a prior act of discrimination will not set the time limitations running anew." *Id.* at 949. However, where there has been a long-standing policy of discrimination, *repeated* attempts to gain employment or promotions may *each* trigger the running of a new limitations period. *Roberts v. North American Rockwell Corp.*, 650 F.2d 823, 827 (6th Cir.1981).

In *Roberts*, a woman continually made oral inquiries about her employment application while it was on file with a company that had an alleged policy of considering only men for the plant. *Id.* at 827. She never received a formal rejection but was told each time of the company's policy of not hiring women at that plant. *Id.* at 827–29. The court concluded that the woman's claim was timely because one of her oral inquiries concerning her application fell within the relevant limitations period, measured backward in time from the date of her complaint. *Id.* at 828.

Dixon and Toki easily establish an "overarching policy" of alleged discrimination with respect to membership determinations of SERS and other Ohio public retirement systems. The allegedly discriminatory policy appears plainly in the Ohio Revised Code and SERS administrators openly adhere to the policy. However, *Roberts* reveals that there must be a specific allegedly discriminatory act against the plaintiff within the relevant limitations period measured back from the time of the complaint. Dixon and Toki can offer none.

Unlike Mrs. Roberts, who never received a formal rejection, Dixon and Toki each received a final rejection as soon as they began receiving payments under another state retirement plan. The statutory scheme regulating membership in the public retirement system does not provide for interim re-evaluation of an employee's eligibility for membership after rejection, and no one has asserted that any such re-evaluations actually occur. There is no evidence that SERS ever solicits applications from existing employees. Out of courtesy or other discretionary motives, SERS responded politely to plaintiffs' belated requests to have their nonmember status re-evaluated; however, the binding decision had been made long before, through a simple application of the statute to plaintiffs' circumstances. Thus the only alleged civil rights violations against plaintiffs occurred when SERS once and for all denied them membership.

It should be clear that without a specific, allegedly discriminatory act against Dixon and Toki within the limitations period, mere existence of an alleged policy of violating equal protection rights will not toll the running of the statute of limitations. *Conlin*, 890 F.2d at 815 (6th Cir.1989). In *Conlin*, male Michigan state civil servants

challenged promotions of females allegedly made pursuant to a Michigan affirmative action plan. *Id.* Two of the males challenged promotions made prior to the limitations period. *Id.* The basis of their claim was section 1983 and the fourteenth amendment. *Id.* at 813. While the two males alleged that Michigan's policies violated the fourteenth amendment on an ongoing basis, the Sixth Circuit held that the claims were time-barred:

> In order to allege a continuing violation with regard to employment decisions, a court is to look at what event " 'should have alerted the average lay person to protect his rights.' "

> \* \* \* \* \* \*

> In the present case, appellants complaint alleged that the policies of the Michigan Civil Service, MDOT, and Treasury, previously and now, violate the fourteenth amendment. However, appellants were certainly aware of the general affirmative action policies at the time of their promotion denials. Indeed, both appellants filed state court actions as early as 1986, showing that at least at that time, they realized that their rights might have been violated.

> Even amending their complaint to allege other discriminatory acts would not have helped them, since these alleged acts were directed at other people. Therefore, the district court correctly dismissed Ruppal's and Victorson's claim based upon the applicable statute of limitations.

*Id.* at 815 (citations and footnote omitted).

Because Dixon and Toki have failed to show a specific allegedly discriminatory act within the relevant two-year period, they cannot invoke the second category of continuing violation to sustain their action.

### III.

Each plaintiff's cause of action accrued when he had reason to know of his injury. The directors' only allegedly discriminatory acts against each plaintiff occurred more than two years before each plaintiff filed charges. These acts effectively put each plaintiff on notice that he thereafter would be treated differently from employees who were not then receiving Ohio state pension benefits. The first category of continuing violation does not apply to Dixon and Toki because once SERS members have been separated from nonmembers, it is not in itself a civil rights violation to treat member employees differently from nonmember employees. The second category of continuing violation does not apply because while SERS and Ohio follow an over-arching policy of alleged discrimination in membership selection, no allegedly discriminatory act occurred within the two-year limitations period measured back from the date Dixon and Toki filed their complaint. Because plaintiffs filed suit more than two years after they had reason to know of their injuries, we hold that plaintiffs' claims were time-barred.

### IV.

For the foregoing reasons, the district court's grant of summary judgment in favor of defendant directors is AFFIRMED.

NATHANIEL R. JONES, Circuit Judge, dissenting.

I conclude that plaintiffs have demonstrated a "continuing violation" and therefore I respectfully dissent.

### I.

As noted by the majority, the district court failed to comment upon plaintiffs' claim of a continuing violation. Although plaintiffs' articulation of this theory was somewhat weak, it was incumbent upon the lower court to, at a minimum, conduct an evaluation of plaintiffs' continuing violation claim in light of the facts stated in the complaint. *Perez v. Laredo Junior College,* 706 F.2d 731, 734 (5th Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984) (allegation of continuing violation must be evaluated in the light of the facts stated in the complaint and those adduced in support of, or against, the motion for summary judgment.); *Dumas v. Town of Mount Vernon, Ala.,* 612 F.2d 974, 977 (5th Cir.1980) (it is incumbent on

the court to analyze the specific claims of continuous discrimination to make sure true continuing violations have been properly alleged). Therefore, I would remand this case to the district court to determine whether plaintiffs' complaint does not fall under the two-year statute of limitations because of the "continuing violation" doctrine. However, since the majority has chosen to decide the issue of whether plaintiffs established a continuing violation claim, it is necessary that I address it.

## II.

The precise contours of the continuing violation doctrine are at best unclear. Notwithstanding the muddled development of this doctrine, however, the circumstances before us present a classic case of a continuing violation. The majority explains the continuing violation doctrine in two categories. Under the first category, a continuing violation "arises where there is some evidence of *present* discriminatory activity giving rise to a claim of a continuing violation[.]" Under the second category, a continuing violation "arises where there has occurred a 'longstanding and demonstrable policy of discrimination' ... [and] a specific allegedly discriminatory act against the plaintiff [has occurred] within the relevant limitations period[.]" The majority draws these categories from this court's language in *E.E.O.C. v. Penton Industrial*, 851 F.2d 835, 838 (6th Cir.1988). In applying these categories to this case, however, the majority failed to correctly apply the first category and misstated the second category.

## III.

The majority asserts that plaintiffs' claim involves solely the "effects" of past discrimination. I disagree. The majority's discussion of the retirement system and its treatment of members and nonmembers is one of semantics. To be sure, it is not a civil rights violation to treat two employees differently where one is a member of a retirement system and the other is not. However, if the determination of membership status itself encroaches upon one's

right to equal protection and membership status is "continually" denied due to such encroachment, a violation may be present.

*Perez v. Laredo Junior College* is strikingly similar to the present case. In *Perez* plaintiff became a faculty member of Laredo Junior College in 1968. Plaintiff held a master's degree in mathematics and taught mathematics at the College. In 1975, plaintiff decided to work on a Doctor of Philosophy degree in Educational Administration and received his Ph.D. degree in 1977. "In 1978, he sought additional compensation pursuant to Laredo's policy of granting a salary increase when a faculty member received a doctorate. His department head denied the increase because such compensation was due under the college's pay policies only if the doctoral degree was in the instructor's teaching field, and [plaintiff] was teaching mathematics, not educational administration." 706 F.2d at 732–33.

Plaintiff commenced suit in federal court alleging that " 'other faculty members of Laredo Junior College, similarly situated, *have been* compensated for doctoral degrees outside their teaching areas.' " *Id.* at 734 (emphasis in original) (quoting complaint). Plaintiff sought to show a continuing violation under the equal protection clause of the fourteenth amendment. Plaintiff asserted that "each day he is not paid on the same basis as another faculty member is a separate violation of his constitutional rights." *Id.* The Fifth Circuit Court of Appeals held:

If the college has, since denying Perez additional pay, paid such compensation to another faculty member, who like Perez, has a doctorate degree outside his teaching field, then the statute does not bar his claim. If, however, any such practice ceased more than two years ago, Perez would be asserting neither a continuing violation manifested by a number of incidents nor a continuing unlawful policy or practice.

*Id.* at 735. In sum, *Perez* held that "the continuing violation theory is available to remedy employment practices and policies that operate to deny employees their pro-

tected rights if the offending practice *continued to be enforced* during the limitations period." *Id.* at 733 (emphasis added). *See also Pike v. City of Mission, Kan.*, 731 F.2d 655, 660 (10th Cir.1984) ("A suit challenging a systematic policy is not barred even though the policy began before the limitations period, because the policy itself continues to violate employees' rights"); *cf. Brewster v. Barnes*, 788 F.2d 985, 993 (4th Cir.1986) (continuing violation of Equal Pay Act such that statute began to run not on day Compensation Board refused pay increase but on last day of plaintiff's employment); *Hall v. Ledex, Inc.*, 669 F.2d 397, 398 (6th Cir.1982) (violation continuing in nature on each denial of equal pay with each check received).

*Perez* is indistinguishable from the case before us. Plaintiffs Dixon and Toki complain that a policy which violates their rights to equal protection operates continuously to deny them pension benefits. Like *Perez*, Dixon and Toki alleged disparate treatment in the distribution of a benefit—in this case pension benefits. Further, like *Perez*, the fact that the defendant denied plaintiffs' right to the benefits does not affect the continuing nature of the injury. Each day Dixon and Toki are treated differently than other similarly situated employees, with respect to their pension benefits, is another violation. As the court never reached the merits of this case, we do not know whether such ongoing violations of plaintiffs' rights are taking place. However, we do know that if the facts are as alleged, the violation is a continuing one for purposes of the statute of limitations.

Moreover, the case before us is quite similar to the situation presented in *Roberts v. North Am. Rockwell Corp.*, 650 F.2d 823 (6th Cir.1981). In *Roberts* plaintiff, a female, attempted to apply for a job with Rockwell in December 1972 but was told that the company had a policy against hiring women. Plaintiff obtained an application by sending her son-in-law into the Unemployment Office to get it for her. Plaintiff submitted the application but heard nothing from Rockwell. From December 1972 through August 1973, plaintiff periodically returned to the Unemploy-

ment Office to inquire as to the status of her application and was repeatedly told that Rockwell did not hire women. On September 11, 1973, plaintiff, along with two other women, returned to the Unemployment Office to apply for jobs with Rockwell but were all refused applications. In September 1973 Rockwell entered into a conciliatory agreement with the Kentucky Commission on Human Rights and dropped its policy of not hiring women. Plaintiff then filed suit under Title VII. Because the complaint was filed more than 180 days after December 1972, the district court dismissed the complaint as time-barred. This was the sole issue raised on appeal.

Plaintiff argued on appeal that she was subjected to an "ongoing pattern of discrimination." *Id.* at 826. Rockwell, on the other hand, contended that the single discriminatory act occurred when they refused to hire plaintiff in December 1972. *Id.* This court agreed with plaintiff's contention. The *Roberts* court stated:

> if there is a continuing violation, the company is continually violating Title VII so long as its discriminatory policy remains in effect.... We see no reason to formalistically require an applicant to continuously apply, only to be continuously rejected.... If an ongoing discriminatory policy is in effect, the violation of Title VII is ongoing as well.

*Id.* at 827. Plaintiffs Dixon and Toki are continually denied the right to participate in a pension plan pursuant to an ongoing policy which is still in effect.

The majority believes that the "one-time" decision to deny plaintiffs membership into SERS constituted a single discriminatory act whose effects are still with us. Dixon, however, alleges that he was last denied membership into SERS on October 26, 1987, and Toki alleges that he was last denied membership in November 1988. Defendants contend that the determination of SERS membership is made at the time of hiring only, and not anytime thereafter. According to defendants, no review of eligibility is ever conducted. However, in responding to plaintiff Dixon's request for a review on October 29, 1987, defendants

stated that "We have reviewed your case and unfortunately we must reach the conclusion that Section 124.85 of the Ohio Revised Code prohibits you from contributing to SERS." Whether subsequent requests for SERS membership are routinely denied because the membership determination is a one-time decision is not dispositive. Plaintiffs re-applied for membership and such re-application was denied. The fact that the subsequent denials are now termed as confirmations of an original decision is not controlling. When the 1987 and 1988 inquiries were made by the plaintiffs, the enforcing authority had to re-visit the statute to see if the policy in question remained the same.

Hence, like the plaintiff in *Roberts*, Dixon and Toki applied for and were denied membership in SERS. Later, they re-applied and were again denied membership based on the same policy. As the court stated in *Roberts*, a plaintiff need not continually apply and be denied if the same discriminatory policy is in effect. Thus, the majority's reliance upon the initial denial of SERS membership is misplaced because, as the majority concedes, the officials were acting pursuant to an ongoing policy. Although the majority purports to rely upon the holding in *Roberts* to support its inability to find a continuing violation in the present case, it only refers to the alternative holding in *Roberts*. The first and primary holding in *Roberts* was that "If an ongoing discriminatory policy is in effect, the violation of Title VII is ongoing as well." 650 F.2d at 827. The alternative holding in *Roberts* was that plaintiff had indeed alleged a discriminatory act which occurred within the limitations period. *Id.* at 828.

Finally, without relying on this ground, I suggest, in accordance with the alternative holding in *Roberts*, that the plaintiffs' "re-application" in this case and the defendant's denial constituted an additional discriminatory act within the limitations period. *See Roberts*, 650 F.2d at 828.

### IV.

There are numerous cases which suggest that the application of the "continuing vio-lation" theory is inconsistent and confusing, and this case may now be added to that number. Given the posture of this difficult case, however, I conclude that it was not ripe for summary judgment. I find that plaintiffs have alleged a continuing violation claim. Therefore, I respectfully dissent from the majority's failure to reverse and/or remand.