**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0397n.06
Filed: July 1, 2008

**No. 07-3575**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| OHIO MIDLAND, INC., ROGER BARACK, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OHIO DEPARTMENT OF TRANSPORTATION, DISTRICT 11, JIM SPAIN, DEPUTY DIRECTOR; THOMAS H. COLLINS; JOE MANCHIN III, WEST VIRGINIA GOVERNOR; NORFOLK SOUTHERN RAILWAY CO.; CITY OF BENWOOD MAYOR'S OFFICE, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| | ) | |
| Defendants-Appellees. | ) | |

Before: GILMAN, ROGERS, McKEAGUE, Circuit Judges.

**ROGERS,** Circuit Judge. In this 42 U.S.C. § 1983 action, the plaintiffs appeal the district court's denial of their motion for leave to amend their complaint and appeal the district court's grant of summary judgment to defendant Norfolk Southern Railway on its counterclaim for breach of contract. Plaintiffs are the owners of a bridge spanning the Ohio River, and have sought to compel the Ohio Department of Transportation either to rebuild the bridge ramp it demolished in 1991 or to pay the plaintiffs damages resulting from lack of the ramp, including the bridge's long-term non-

use and the plaintiffs' potential liability to tear the bridge down pursuant to a demolition order from the United States Coast Guard. For the following reasons, we uphold both the district court's denial of leave to amend and its grant of summary judgment to Norfolk Southern.

## I. Factual Background

On September 12, 1922, Congress authorized the Interstate Bridge Company (IBC) to construct, maintain, and operate a toll bridge over the Ohio River between Bellaire, Ohio, and Benwood, West Virginia, reserving to itself the authority to alter, amend, or repeal the act. *See* H.B. 11901. Before constructing the bridge, IBC leased from the Pennsylvania Railroad Company a parcel of land on the Ohio side of the river for construction of one of the bridge's piers. The lease agreement provided that IBC "shall at its own cost and expense construct, maintain, renew, and ultimately remove said bridge and pier and each and every part thereof, upon, over and across the tracks and property owned or controlled by" the Pennsylvania Railroad Company, and also provided that the agreement would be binding on both parties' successors and assigns. Defendant Norfolk Southern Railway Company is a successor of the Pennsylvania Railroad Company.

The Bellaire Bridge operated as a toll bridge until 1991, when the Ohio Department of Transportation (ODOT) purchased from IBC the bridge ramp on the Ohio side of the river and its underlying land for the purpose of constructing Ohio Route 7, which construction would require that the bridge ramp be torn down. The plaintiffs in the instant case allege that two contracts were involved in this purchase. According to the plaintiffs, the first contract—executed on December 5,

- 2 -

1990—made no provision for damages to the residue of the bridge owned by IBC. Plaintiffs also claim that the December 5 contract entitled IBC to salvage materials from the area of the ramp acquired by ODOT. A later contract executed on January 7, 1991, however, allegedly required compensation for damages to the residue of the bridge. The plaintiffs claim that the second contract is void for lack of consideration and because IBC did not sign it. Accordingly, the plaintiffs claim that the first contract, in which compensation for damage to the bridge residue is not provided, is controlling.

Following sale of the bridge ramp to ODOT, plaintiff Roger Barack purchased IBC's remaining interest in the bridge on March 21, 1991. Barack and IBC acknowledged in the purchase agreement that "the liabilities assumed clearly exceed the assets transferred," and in consideration for Barack's assumption of IBC's liabilities, IBC paid Barack $700,000, less the amount it would cost IBC to terminate a demolition contract. The agreement specifically acknowledged ODOT's purchase of the bridge ramp and provided that Barack would assume, among other liabilities, all liabilities of IBC

> arising by reason of that certain Purchase Agreement whereby the Ohio Department of Transportation purchased the Ohio ramp to the Bellaire Bridge owned by [IBC] and conveyed therewith by Agreement dated the 5th day of December, 1990, and as supplemented by letter addendum to said Agreement dated December 17, 1990, and as supplemented by Contract of Sale and Purchase dated January 7, 1991, by and between [ODOT] and [IBC] . . . .

JA 182-83. The agreement also provided that Barack would assume "[a]ll liabilities or future obligations of [IBC] arising by reason of the ownership of the Bellaire Bridge, including any

obligation on the part of [IBC] to demolish, raze and remove the remaining bridge structure . . . ." Plaintiffs claim that, around the same time that ODOT tore down the ramp and constructed Route 7 in its place, ODOT bought land and prepared plans to rebuild the ramp over the newly constructed Route 7, which would have allowed the bridge to continue operation as a toll bridge. Barack claims that, believing ODOT intended to rebuild the ramp, he intended to resume operation of the bridge as a toll bridge.

ODOT denies having had any plans to rebuild the ramp, however, and has not rebuilt the ramp. In his original complaint, Barack alleged that after he purchased the remaining portion of the bridge, ODOT "aborted its plans to build a ramp over State Route 7 in its newly acquired right-of-way obtained especially for the ramp," and that ODOT would not permit him to build his own ramp. In his unsuccessful attempt to amend his complaint, Barack alleged that he "observed that ODOT did not proceed with its plans to build a new ramp" and that he "then made repeated requests to ODOT over a number of years to grant him permission to build the ramp," which ODOT did not act on and "neither granted [n]or refused Plaintiffs permission to build a new ramp." It is difficult to pinpoint exactly when these events or non-events occurred, but all parties appear to operate on the assumption that *if* ODOT had plans to rebuild the ramp after constructing Route 7, such plans were abandoned in the early 1990s. In 1996, Barack assigned all of his interest in the remaining portion of the bridge to co-plaintiff Ohio Midland, Inc.

In November 1998, upon an initial determination that the bridge was an unreasonable obstruction to navigation given that it had long ceased to operate, the United States Coast Guard

issued Barack a notice to demolish the bridge and provide demolition plans within 60 days. According to the Coast Guard, Barack "neither submitted demolition plans . . . nor made any attempts to discuss the matter with the Coast Guard." As a result, on November 14, 2001, the Coast Guard ordered Barack to remove the bridge. Barack did not remove the bridge, and in September 2002 the Coast Guard brought an administrative action against Barack to impose civil penalties, which were imposed by a hearing officer on April 21, 2004. On October 18, 2005, the Coast Guard Commandant affirmed the order to remove the bridge, but reduced Barack's civil penalties from $598,200 to $300,000 plus interest and costs.

On November 17, 2005, Barack filed a complaint against the Commandant under the Administrative Procedure Act, challenging the Coast Guard's October 18, 2005, decisions (Case No. C2-05-1044). Three weeks later, plaintiffs Barack and Ohio Midland filed another complaint against numerous defendants, including the Commandant (Case No. C2-05-1097).[1] Case 1097 is the case currently before this court. The district court consolidated Cases 1044 and 1097, finding that the cases contained common questions of law and fact. In May 2006, the Commandant filed a motion for voluntary remand in Case 1044 to permit the Coast Guard to conduct a detailed investigation into whether the bridge constitutes an unreasonable obstruction to navigation and to reconsider its decision to impose civil penalties. The district court granted the motion. The court then dismissed

---

[1]Named as defendants were Gordon Proctor, Director of ODOT; Jim Spain, Deputy Director of ODOT; Admiral Thomas Collins, U.S. Coast Guard Commandant; Joe Manchin III, Governor of West Virginia; Norfolk Southern Railway; and the Mayor's Office of the City of Benwood, West Virginia.

the Commandant from Case 1097, the case before this court, on the basis that Barack's claims against the Commandant in Case 1097 were duplicative of his claims in Case 1044.

In Claim One of Case 1097 currently before this court, the plaintiffs alleged that, as successors to IBC, they are entitled to compensation for the damage to the remainder of the bridge caused by ODOT's alleged taking of the ramp. The plaintiffs also claimed that ODOT breached its contract with IBC, and therefore with the plaintiffs, by not providing IBC the salvage materials from the demolition of the ramp (Claim Two), and that ODOT violated the plaintiffs' civil rights "to construct, maintain, and operate" the bridge because ODOT violated House Bill 11901 by closing the bridge without federal permission (Claims Three and Four). As remedies, the plaintiffs requested the fair market value of the salvage materials, and requested that ODOT be ordered to construct a new ramp and pay damages for loss of toll profits dating from ODOT's removal of the ramp. If ODOT was not ordered to construct a new ramp, the plaintiffs sought to compel ODOT to file appropriation proceedings to determine the amount of damages due to the plaintiffs caused by ODOT's alleged taking of the ramp. The plaintiffs also requested that ODOT be ordered to pay the plaintiffs' civil penalties and cost of bridge removal if the court did not enjoin the Coast Guard's removal order. Finally, the plaintiffs requested in Claim Five that "if Defendants ODOT are not compelled to construct a new ramp . . . and the bridge is deemed abandoned then the remainder of the bridge as a structure should be ordered to revert to the owners of the land," which allegedly includes the State of West Virginia, the City of Benwood, the U.S. Coast Guard, and Norfolk Southern Railway.

Subsequently, West Virginia Governor Joe Manchin III filed a motion to dismiss Claim Five regarding what should happen if the bridge is deemed abandoned, which the district court granted, finding that the claim was "purely conjectural" and therefore not ripe. In response, the plaintiffs filed both a motion for reconsideration of the court's dismissal of Claim Five and a motion for leave to file an amended complaint. Both motions were filed on the same day. The district court interpreted this as an effort to cure the ripeness defect in Claim Five and denied both motions. In considering the plaintiffs' motion for leave to amend, the court focused entirely on Claim Five, concluding that amendment would be futile because it would not cure the ripeness problem. The court did not address the plaintiffs' proposed amendments to Claims One, Two, Three, Four, or Eight, which, among other things, clarified: that Claims One and Two were takings claims brought pursuant to 42 U.S.C. § 1983; that ODOT employees Proctor and Spain were being sued in their individual capacities; and that Proctor and Spain violated 33 U.S.C. § 491 by deviating from the approved bridge plans without permission from the United States Secretary of Transportation. The plaintiffs subsequently filed a motion for clarification regarding whether the district court intended to deny plaintiffs' motion for leave to amend with respect to all claims, or merely Claim Five.

In the meantime, the district court granted the ODOT defendants' motion to dismiss, concluding that they are shielded from monetary liability by sovereign immunity and that all of the plaintiffs' claims are barred by the applicable statute of limitations. Referring to the plaintiffs' original complaint, the court acknowledged confusion regarding whether Proctor and Spain had been sued in their official or personal capacities:

> Plaintiffs admit that their original Complaint did not make explicit allegations of personal liability, so that one might reasonably interpret the Complaint as seeking to impose official liability enforceable against State funds. They seek to clarify their intent in the Proposed Amended Complaint, which has been denied. This Court will, however, consider Plaintiffs' claims in light of their intent set forth in their Response in Opposition.

JA 382 n.7. Finding that both parties had treated the suit as an official-capacity suit, the court concluded that the plaintiffs' claims were barred by the Eleventh Amendment insofar as they sought money damages. To the extent that the plaintiffs sought prospective relief, the court concluded that the plaintiffs' claims were barred by the applicable statute of limitations. Reasoning that the plaintiffs knew of their injury in 1990-91 at the earliest and in 2001 at the latest, the court concluded that the plaintiffs' claims accrued much longer than two years before suit was initiated in 2005. The court additionally rejected plaintiffs' argument that ODOT's "continued decision" not to rebuild the bridge was a "continuing violation" that tolled the statute of limitations.

In response to the plaintiffs' motion for clarification, the district court clarified in March 2007 that its "November 28, 2006 Order denying leave [to amend] applied to Plaintiffs' *entire* proposed amended complaint, not only to Claim 5." The court offered no elaboration, other than that "Plaintiffs have not thus far submitted a proposed amended complaint that satisfies Rule 15(a) of the Federal Rules of Civil Procedure."

During the course of proceedings, defendant Norfolk Southern Railway had both filed a counterclaim against plaintiffs for breach of contract and moved for summary judgment on that claim. Norfolk Southern's counterclaim alleged that, because IBC was obligated by the Lease

Agreement with the Pennsylvania Railroad Company, Norfolk's predecessor, to "at its own cost and expense . . . ultimately remove [the] bridge and pier and each and every part thereof," the plaintiffs, having assumed for consideration all of IBC's liabilities concerning the bridge, owe an obligation to Norfolk to comply with the terms of the Lease Agreement and have therefore breached the contract by failing to remove the bridge. The district court granted Norfolk Southern's motion for summary judgment, holding that the plaintiffs' contractual duty to remove the bridge had arisen because of the long-term non-use of the bridge, and rejecting plaintiffs' argument that its obligation to remove the bridge had not been triggered because the Coast Guard may ultimately reverse its order to demolish the bridge.

On appeal, the plaintiffs argue that the district court abused its discretion by denying leave to amend Claims One, Two, Three, Four, and Eight against Proctor and Spain, and that the court erred in granting summary judgment to Norfolk Southern on its counterclaim for breach of contract.

**II. Motion to Amend**

The district court did not abuse its discretion in denying the plaintiffs leave to amend their complaint. Although denial of leave to amend with no accompanying explanation is generally an abuse of discretion, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), failure to provide an explanation is not *per se* an abuse of discretion if, as here, the reasons are readily apparent, *see Troxell v. Manufacturing Co. v. Schwinn Bicycle Co.*, 489 F.2d 968, 971 (6th Cir. 1973); *Miller v. Administrative Office of Courts*, 448 F.3d 887, 898 (6th Cir. 2006). It is clear from the district

court's dismissal of plaintiffs' original claims against the ODOT defendants that the court considered those claims to be time-barred. The court concluded that the applicable statute of limitations had long expired, and rejected plaintiffs' argument that the statute had been tolled on a continuing-violation theory. Although the district court was considering the plaintiffs' claims for prospective relief in so concluding, the plaintiffs' amended claims against Proctor and Spain for damages would fail for the same reason. It is thus readily apparent from the district court's earlier reasoning that leave to amend Claims One, Two, Three, Four, and Eight was denied because the court concluded that amendment would be futile.

Moreover, we agree that amendment of Claims One, Two, Three, Four, and Eight would indeed have been futile.[2] Because the plaintiffs' amended claims accrued much longer than two years before suit was commenced and do not fall into the "continuing violation" category of claims for which tolling is appropriate, the plaintiffs' amended claims are all barred by the applicable statute of limitations.

The plaintiffs' theory of taking is that a taking occurred because the economic value of the bridge was destroyed. The economic value of the bridge was destroyed because the Ohio ramp was not rebuilt, thus effectively closing the bridge. *See* Proposed Amended Complaint ¶¶ 19-20 ("Such

---

[2]When a district court denies leave to amend on the ground that the proposed amendment would not survive a motion to dismiss, the standard of review is *de novo*. *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 522 (6th Cir. 1999). Although the district court did not explicitly provide futility as its reason for denying leave to amend Claims 1, 2, 3, 4, and 8, we review its denial *de novo* in accordance with our conclusion that futility is the reason readily apparent from the record for the denial.

closure prevented any use of the Bridge and substantially reduced or destroyed the fair market value of the residue of the Bridge, and constitutes a taking . . . ."). Under the plaintiffs' theory, then, the relevant time that plaintiffs would be "on notice" of the taking is the time they were on notice that they would not be receiving a new ramp. *See Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001) (holding that the statute of limitations begins to run under federal law "when plaintiffs knew or should have known of the injury which forms the basis of their claims"); *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997) ("In determining when the cause of action accrues in section 1983 actions, [courts] have looked to what event should have alerted the typical lay persons to protect his or her rights.").

According to the plaintiffs, the Ohio ramp was not rebuilt for two reasons: (1) ODOT refused to rebuild the ramp; and (2) ODOT never responded to Barack's requests to build a new ramp himself. As stated above, although the precise timing is not clear from the record, it is clear that Barack would have been on notice during the early 1990s that ODOT did not intend to rebuild the ramp. Moreover, Barack realistically was on notice that ODOT did not intend to allow him to build his own ramp sometime during the early 1990s, when ODOT is alleged to have repeatedly refused to grant Barack permission to build his own ramp, whether through an outright denial of permission or inaction on his requests. Even giving plaintiffs the benefit of the doubt, Barack was certainly on notice that there would be no new ramp in 1998, when ODOT was prepared to stand by and allow the bridge to be razed following the Coast Guard's demolition order. Consequently, the plaintiffs had reason to know of their injury in the early 1990s, and in 1998 at the latest, and the statute of

limitations therefore accrued much longer than two years before plaintiffs commenced suit in 2005. *Owens v. Okure*, 488 U.S. 235, 239-41, 250 (1989) (holding that the statute of limitations for § 1983 claims is the most closely analogous state limitations period for general personal injury claims); *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (holding that the analogous Ohio statute is O.R.C. § 2305.10(A), which provides a limitations period of 2 years). The plaintiffs' amended Claims One, Two, Three, Four, and Eight, all stemming from the same events, are therefore time-barred.[3]

The plaintiffs seek to avoid this conclusion by arguing that, because the ODOT defendants could theoretically have authorized the construction of a new ramp until the Coast Guard finally ordered the bridge's demolition, the plaintiffs' injury did not become permanent, and thus the statute of limitations did not begin to accrue, until October 2005. This argument is unpersuasive. Assuming plaintiffs are correct that the statute of limitations did not begin to accrue until it became clear that their injury was permanent, the relevant inquiry is permanent versus temporary, not physical possibility versus impossibility. On plaintiffs' theory of taking, the time at which the deprivation became "permanent rather than temporary" is determined by ODOT, not by the Coast Guard's actions. After all, the plaintiffs' theory is that ODOT's refusal to build or allow construction of a new ramp has rendered the bridge economically valueless. Regardless of the Coast Guard's

---

[3]The foregoing statute-of-limitations analysis applies to each of plaintiffs' proposed amended claims (1, 2, 3, 4, and 8). As the ODOT defendants explained, "Plaintiffs' claims are all premised upon actions taken in 1990-1991 regarding the removal of the bridge ramp. This is when they did not receive compensation, it is when they were not allowed to remove salvage materials, and when the bridge was closed without federal permission."

actions, the bridge is economically valueless on this theory as long as ODOT maintains its position

not to allow construction of a new ramp. Consequently, while it is easy to see how the Coast

Guard's order to demolish the bridge renders the bridge's lack of value "permanent," the plaintiffs'

injury was "permanent rather than temporary" in the relevant sense when it was clear that ODOT

would neither build nor allow construction of a new ramp. As explained above, this occurred in

1998 at the latest.[4]

The plaintiffs also seek to avoid the conclusion that their amended claims are time-barred by

arguing that the statute of limitations was tolled because the ODOT defendants' actions or inactions

constituted a "continuing violation" that recurred every second the violation was not stopped. This

argument is also unpersuasive. Contrary to the plaintiffs' assertions, the fact that Proctor and Spain

did not reverse ODOT's early-1990s decisions does not fit into the "continuing violation"

framework.

Courts have allowed the statute of limitations to be tolled when: (1) "there is some evidence

of present [prohibited] activity giving rise to a claim of a continuing violation" and "at least one of

the forbidden . . . acts occurs within the relevant limitations period"; or (2) there is a "longstanding

and demonstrable policy" of the forbidden activity. *See Trzebuckowski v. City of Cleveland*, 319

F.3d 853, 857 (6th Cir. 2003). This court has distinguished between "continuing violations" and

---

[4]The plaintiffs also emphasize the finality of the Coast Guard's decision. *See* Blue Br. 27 ("Simply put, the 1998 notice, 2001 order and 2004 hearing officer decision were not final agency action."). But this does not say when the statute of limitations began to accrue.

- 13 -

"continuing effects of prior violations," however, and clarified that "the present effects of past discrimination . . . do not trigger a continuing violations exception." *Tenenbaum v. Caldera*, 45 F. App'x 416, 419 (6th Cir 2002) (citing *Dixon v. Anderson*, 928 F.2d 212, 216 (6th Cir. 1991) (abrogated on other grounds)). And, as the district court noted, courts have been "extremely reluctant to apply [the continuing violations] doctrine outside of the context of Title VII." *LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1105 n.3 (6th Cir. 1995)).

The instant case is not one in which a series of repeated constitutional violations occurred. Rather, one alleged constitutional violation occurred in the early 1990s that simply was not reversed. As the district court explained, the ODOT defendants' alleged "continued decision" not to rebuild the ramp was merely a manifestation of the alleged prior taking.[5] The plaintiffs' amended claims therefore do not fit within the continuing-violations framework.

That this case does not fall into the "continuing violations" framework also makes sense. If this court were to accept the plaintiffs' theory that a taking is continuous until it is reversed, then all

---

[5]The plaintiffs cite *Gordon v. City of Warren*, 579 F.2d 386 (6th Cir. 1978), in which this court held that, by imposing a stop order against the plaintiffs' use of property in accordance with a local ordinance, seeking an injunction, defending the appeals of that injunction, and maintaining the stop order throughout the entire course of the litigation, the locality engaged in a "continuing course of action which made it impossible for the plaintiffs to enjoy the full use of their property," thereby tolling the statute of limitations. The instant case is distinguishable in that all Proctor and Spain are alleged to have done is not reverse what plaintiffs consider to be the original taking. Moreover, *Gordon* has been repeatedly distinguished in this and other circuits. *See Kuhnle Bros. v. County of Geauga*, 103 F.3d 516, 521 n.4 (6th Cir. 1997); *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 858 (6th Cir. 2003); *Cowell v. Palmer Tp.*, 263 F.3d 286, 293 (3d Cir. 2001); *Ocean Acres Ltd. v. Dare County Bd. of Health*, 707 F.2d 103, 106 (4th Cir. 1983).

takings would constitute "continuing violations," tolling the statute of limitations. There would effectively be no statute of limitations, and the plaintiffs' theory could easily be extended to many other violations outside of the takings context. This is not the law.

### III. Summary Judgment to Norfolk Southern

We also affirm the district court's grant of summary judgment to Norfolk Southern on its counterclaim for breach of contract. The plaintiffs are bound to Norfolk Southern by the Lease Agreement executed between the Pennsylvania Railroad Company and IBC and have a contractual obligation to "ultimately remove" the bridge. The plaintiffs argued before the district court that "performance of the promise to 'ultimately remove' the Bridge is not due at this time because the issue whether it must be removed has not been brought finally to the end," noting that the Coast Guard had sought a voluntary remand for further consideration of its orders and that the district court had not yet ruled on the issue of the bridge's removal. The court disagreed. On the district court's reading of the Lease Agreement, "the contract as a whole . . . implies that, once the land is no longer being used for the Bridge, the lessee [plaintiffs] must remove the structure." The court concluded on this basis that plaintiffs' contractual duty to remove the bridge had, indeed, become due, regardless of the Coast Guard's ultimate determination regarding whether the bridge is an unreasonable obstruction to navigation, because "[t]he Bridge has been non-functioning for years," and "the term 'ultimate removal' does not rely on outside determinations" and "[t]he parties' intent, under the plain meaning of the contract, gives no regard to any determinations made by the Coast Guard." Accordingly, the district court concluded that the plaintiffs breached their contract with

Norfolk Southern by failing to remove the bridge and ordered Barack to remove it for "'the protection and safety of the property owned . . . as well as the protection and safety of the employees, patrons and licensees' of Norfolk." JA 425 (citing the Lease Agreement).

On appeal, the plaintiffs have conceded—both in their briefs and at oral argument—the district court's premise that the Lease Agreement requires them to remove the bridge once it can no longer be used as a bridge: "If [plaintiffs] . . . were granted the injunctive relief they have requested, a new ramp would be built and they would be able . . . to operate the Bridge. They would not have a duty to 'ultimately remove' the portion on and over Norfolk Southern's property, so long as it remained in operation." The plaintiffs made similar statements in their reply brief, explaining that if the Coast Guard allows the bridge to stand and the court orders ODOT to allow construction of a new ramp, "then the Bridge can or will still be operable. In that case Ohio Midland and Barack will not have a contractual duty at that time to 'ultimately remove' the Bridge because it may still be used as a Bridge." Because all parties agree that the plaintiffs have a contractual duty to remove the bridge once it can no longer be used as a bridge, it is fair to say—as the district court did— that this duty was triggered sometime in the sixteen years during which the bridge has been inoperable with no reasonable expectation of re-use. This duty in no way hinges on the actions of the Coast

Guard.[6]  Consequently, the plaintiffs' sixteen-year failure to remove the bridge constitutes a breach of contract.[7]

**IV. Conclusion**

The district court did not abuse its discretion in denying plaintiffs' motion for leave to amend their complaint and the court properly granted summary judgment to Norfolk Southern on its counterclaim for breach of contract.  We therefore affirm.

---

[6]For this reason, the plaintiffs' extended discussion of primary jurisdiction is not on point.

[7]We do not address the plaintiffs' arguments concerning mutual mistake of fact and frustration of purpose because these arguments were not raised below.