Julianne **FARRELL** and Edda Martin,
Plaintiffs, Appellants,

v.

**BANK OF NEW
HAMPSHIRE–PORTSMOUTH,**
Defendant, Appellee.

No. 90–2132.

United States Court of Appeals,
First Circuit.

Heard March 6, 1991.
Decided April 8, 1991.

---

Sharon J. Rondeau, with whom Stephen J.C. Woods, and Woods Law Office were on brief, for plaintiffs, appellants.

Frank P. Spinella, Jr., with whom Hibbard & Spinella, P.A., was on brief, for defendant, appellee.

Before CAMPBELL, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

The major question in this appeal is whether, in an action by two debtors' spouses against a creditor, claiming discrimination under the Equal Credit Opportunity Act ("the Act"), 15 U.S.C. §§ 1691–1691f, the action accrues for statute of limitations purposes when the alleged discriminatory act occurs or when the spouses receive notification of the act. The question requires us to interpret the statutory provision requiring an action to be brought no later "than two years from the date of the occurrence of the violation." 15 U.S.C. § 1691e(f). The district court, concluding that the proper focus was the bank's discriminatory act rather than the subsequent receipt of official notice by the plaintiff spouses, entered summary judgment for the creditor bank.

Section 1691(a)(1) of the Act makes it unlawful for any creditor to discriminate in any credit transaction on the basis of marital status. Relevant regulations provide more specifically that a creditor "shall not require that [a loan] applicant's spouse be the additional party," in the event that the creditor requires a co-signer or guarantor. 12 C.F.R. § 202.7(d)(5) (1990). *See also* 12 C.F.R. § 202.7(d)(1) (1990) (creditor "shall not require the signature of an applicant's spouse ... on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness").

Plaintiffs/appellants are the wives of two members of a partnership which applied for a commercial loan from defendant/appellee bank on April 15, 1988. A bank commitment letter to the partnership, dated May 2, 1988, and accepted in writing by the partners on May 3, 1988, stated that "[[t]his loan will be secured by a first real estate mortgage[,] ... [g]uaranty of [the partnership], [and] personal guarantes of all the partners and their respective spouses...."[1] On June 3, 1988, the date of closing, a bank agent went to the home of each plaintiff and secured her signature to a personal guaranty. Both plaintiffs averred in affidavits that prior to this date they "did not receive any correspondence and/or other communication from the Bank." The complaint was filed on June 1, 1990. Only if the date of closing, when plaintiffs affixed their signatures, is held to have been the "occurrence of the violation", would the suit be timely filed.

---

1. According to an affidavit of appellee's president, which accompanied its motion for summary judgment, and which remained unrebutted, the partnership did not, on its own, meet the bank's standards of creditworthiness, and at some point prior to the drafting of the commitment letter "defendant requested guarantors and suggested to the individual partners that their personal guarantees and those of their spouses would be acceptable. The partners readily agreed to this." A further averment was that the guarantees of the spouses was not made a precondition and that "had the spousal guarantees not been agreed to, the possibility of alternate sureties would have been explored." In light of our disposition, however, we do not reach appellee's argument, based on this affidavit, that there was never any violation of the Act in the first place.

A preliminary issue is whether, even assuming appellants' notice theory is correct, they have done enough to defeat summary judgment on this record. As the district court observed, "[n]either plaintiff asserts that she was ignorant of her husband's agreement that they all provide personal guarantees...." Appellants argue that their denial of having received any communication from the bank, in conjunction with the rule that we construe facts and inferences in favor of those opposing summary judgment, is enough. Appellee responds that if it has the burden of going forward in a situation like this with an affidavit representing that a spouse had obtained knowledge of a requirement for her signature, it would seldom, if ever, be entitled to summary judgment.

 While we recognize and of course follow the principle of construing the facts in favor of the party opposing summary judgment, the simple disavowal by a spouse of receipt of communications from the bank concerning a significant financial transaction involving both the spouse and her husband, with whom she is living, does not reasonably imply that she had no notice of the existence of a bank requirement affecting her. Were we to accept the adequacy of such an affidavit, we would have added to the Act by judicial amendment a requirement that banks always obtain written evidence of having notified the cosigning spouse, independent of any communication sent to the applicant spouse. As we explain below, the statute of limitations began to run on May 2. There is no express requirement in the Act that the cosigning spouse receive individual notice in order to trigger the statute of limitations and we do not find that Congress intended any such special requirement, *infra*. If, nonetheless, plaintiffs meant to assert the benefit of some equitable tolling exception based on a claim of total ignorance of the illegal condition prior to June 3, they were obliged at the very least to file a counter affidavit specifically claiming not merely lack of notice but lack of actual knowledge. This they did not do.

We now turn to the central focus of inquiry: the time when the cause of action accrued. Appellee argued below that the date of the "occurrence" was May 3, 1988, when the partners accepted the commitment letter setting forth all requirements. Appellants urge June 3, the date when they were approached for their signatures by the bank agent. And the district court chose May 2, when the bank took the step of requiring the spousal guarantees.

Appellants rely upon *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), and *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981), for the proposition that a statute of limitations in cases like this begins to run not when the adverse action occurred but when an aggrieved party is notified of the decision. It is true that both decisions refer to the receipt of notice by the injured party. In *Ricks*, a denial of academic tenure case, the relevant Title VII limitations period for filing an employment discrimination complaint with the EEOC began when "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e). The Court stated that "the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated to Ricks." 449 U.S. at 258, 101 S.Ct. at 504. And in *Chardon*, a 42 U.S.C. § 1983 case involving the termination of employment of public employees, the Court similarly stated that "the operative decision was made—and notice given—in advance of a designated date on which employment terminated." 454 U.S. at 8, 102 S.Ct. at 29.

In both cases, however, the key question was whether the illegal act in denying tenure or in terminating employment took place when "the consequences [became] painful", 454 U.S. at 8, 102 S.Ct. at 29, that is, on the last day of employment, or at the time the decision was made and the employee notified. In each case, the Court rejected the former alternative and was not called upon to define with precision the latter.

The Court assumed that a claimant would be given notice of the adverse decision before it could be called an "act" triggering the statute of limitations. The basis of the Court's assumption seems obvious. Were the triggering act simply a vote of a decision-making body or the recorded minute of decision of an individual, uncommunicated to anyone else, it is hard to see any legal consequences attending the vote or minute. It remains solely within the power of the decider to revoke, to alter, or even not to reveal the decision for the limitations period. Something more is needed to clothe the decision with sufficient objective evidence of its existence to warrant calling it an "act". In the case of employment and tenure decisions, the normal if not universal means of meeting that test is a communication to the person who is the object of the adverse decision. In the case at bar, a sufficient indicium of existence was the delivery of the bank's commitment letter to the partners. We thus agree with the district court that the two-year limitations period commenced to run on May 2.

Regardless of the implications of *Ricks* and *Chardon* in the Title VII and § 1983 contexts, every statute demands a particular analysis of its own terms, legislative history, and policy objectives. The terms of 15 U.S.C. § 1691e(f), "date of the occurrence of the violation," do not answer our question. But the legislative history is on point and helpful.

Prior to amendments in 1976, the limitation period within which an aggrieved person could bring an action was one year. In 1976, the Act was changed to enlarge the limitation period to two years and to give a claimant a further year after the commencement (within two years) of an enforcement proceeding or a civil action instituted by the Attorney General. § 1691e(f).[2] The relevant passage of the Senate report accompanying the amendments states:

> The Committee also recommends a change in the statute of limitations applicable to actions brought under this Act.

The present one-year limitation is, we believe, too short a period of time for violations of antidiscrimination legislation. The development and investigation of the necessary facts—especially in the case of agency or Attorney General actions—may require more than a year. Discriminatory practices, unlike violations of Truth in Lending, are not apparent from the face of particular documents or contracts. The Committee therefore recommends that the statute of limitations be extended to two years. In addition, where an agency or [A]ttorney General action has been commenced within two years of a violation, and where it is likely that individual applicants may only learn of potential violations through publicity surrounding the government's action, we believe the affected applicant should have a reasonable additional time to bring his or her private action. The bill therefore permits private actions to be brought within one year after the commencement of a government action where both involve the same conduct.

S.Rep. No. 94–589, 94th Cong., 2d Sess. 14, *reprinted in* 1976 U.S.Code Cong. & Admin.News 403, 416. It is clear that were we to judicially engraft a requirement of notice to the individual claimant, we would be disregarding the way in which the Congress sought to accommodate aggrieved individuals—by doubling the general limitations period and by providing an additional year following the commencement of timely government enforcement proceedings or civil actions.

We recognize that there could be circumstances in which even these liberalized provisions might not be sufficient to protect a spouse. The principles underlying equitable tolling, which are "sparingly" applied, would govern any such case. *See Irwin v. Veterans Admin.*, —— U.S. ——, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990).

---

**2.** Section 1691c of the Act provides for administrative enforcement by a number of federal agencies, and under § 1691e(g), such agencies, if unable to obtain compliance, may refer a matter to the Attorney General for institution of a civil action.

There is nothing in the instant case to suggest invoking those principles.

The judgment is *AFFIRMED*.