Latonya CLAYBROOKS, Major Gooch, Edwin and Grace Borlay, husband and wife, Arlesia Frelix, Valerie McSterling, Petri Spivey, Larry Mitchell, and Tabitha Holland, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

PRIMUS AUTOMOTIVE FINANCIAL SERVICES, INC., a New York corporation, Primus Financial Services, a division of Ford Motor Credit Company, Defendants.

No. CIV.3:02–0382.

United States District Court,
M.D. Tennessee,
Nashville Division.

Jan. 18, 2005.

**970**

Clinton W. Watkins, Brentwood, TN, Michael E. Terry, Nashville, TN, Richard T. Dorman, Robert T. Cunningham, Jr., John T. Crowder, Jr., David G. Wirtes, Jr., Richard Edwin Lamberth, Cunningham, Bounds, Yance, Crowder & Brown, LLC, Mobile, AL, Wyman O. Gilmore, Jr., Gil-

more Law Office, Grove Hill, AL, for Plaintiffs.

Thomas M. Byrne, Valerie S. Sanders, Rocco E. Testani, Daniel H. Schlueter, Sutherland, Asbill & Brennan, Atlanta, GA, Neil K. Gilman, John H. Beisner, Rachel A. Shapiro, O'Melveny and Myers, LLP, Washington, DC, Anita L. Whisnant, Franklin, TN, for Defendants.

## MEMORANDUM

TRAUGER, District Judge.

Pending before the Court is the Motion for Summary Judgment filed by defendants PRIMUS Automotive Financial Services, Inc. and PRIMUS Financial Services (collectively "PRIMUS") (Docket No. 155), in which defendants seek summary judgment as to plaintiffs LaTonya Claybrooks, Major Gooch, Valerie McSterling, and Arlesia Frelix. The plaintiffs have filed a response (Docket No. 175), and defendants have replied (Docket No. 183). For the reasons stated herein, defendants' Motion will be granted.

### Factual Background and Procedural History [1]

Defendant PRIMUS Automotive Financial Services, Inc. is a New York corporation with its principal business offices in Franklin, Tennessee. Defendant PRIMUS Financial Services is a division of Ford Motor Credit Company and conducted business in the State of Tennessee during the relevant time period. Plaintiffs contend that defendants provide automobile dealers with retail financing, which allows consumers to purchase automobiles through numerous dealerships throughout

---

1. Except as otherwise noted, the factual background is drawn from the Fourth Amended Class Action Complaint (Docket No. 144), the Answer to the Fourth Amended Complaint and Counterclaims (Docket No. 147), Plain-

tiffs' Response to Defendants' Statement of Undisputed Material Facts (Docket No. 176), and Defendants' Response to Plaintiffs' Statement of Disputed Facts (Docket No. 184).

the country. Defendants dispute this characterization. Plaintiffs contend that PRIMUS has established and used a discriminatory credit-pricing system for dealer indirect loans that includes a subjective pricing component or "mark-up policy." Plaintiffs assert that, pursuant to this system, PRIMUS provides the dealer arrangers/originators with forms, policies, and rate sheets for financing automobile purchases through these loans and authorizes the dealers to arrange/originate PRIMUS financing. Plaintiffs contend that PRIMUS sets an objective "buy rate" for particular transactions based on the credit risk tier assigned by them to each customer; thus, the buy rate is the minimum finance charge for a particular customer after consideration of all risk-related variables pertaining to the customer's purchase. Defendants admit only that they consider various risk-related factors in evaluating credit applications and that the risk-tier assignment processes are objective and non-discriminatory.

Plaintiffs assert that, as arrangers/originators of the loans, the dealers submit loan applications to PRIMUS, which sends back a credit decision. All loan applicants are assigned a risk tier. Plaintiffs contend that PRIMUS provides dealers with rate sheets, which inform the dealers both of the buy rates for different tiers and the available mark-up for each tier. The "mark-up" is the non-risk-related finance charge added to the buy rate, and it is paid by the customer to PRIMUS as a component of the total finance charge, without the customer's knowing that her total finance charge (or "Contract APR") includes a mark-up. Plaintiffs contend that, pursuant to PRIMUS policies, the dealer is permitted to mark up the buy rate within a range authorized by PRIMUS, thereby authorizing dealers to set the final cost of credit for PRIMUS financing within the parameters set by PRIMUS. Some portion of the mark-up is paid by PRIMUS to the dealer and is called "dealer participation," while the remainder is retained by PRIMUS as "PRIMUS participation." Defendants dispute these facts. It is undisputed both that none of the documents signed by plaintiffs separately disclose PRIMUS's buy rates and that the credit application form does not state that the dealer is involved in pricing.

It is undisputed that plaintiffs LaTonya Claybrooks and Major Gooch entered into a retail installment contract with Rivergate Automart Kia for the purchase of a used, 1997 Ford Aspire on or about April 8, 1999 with an APR of 15.50%, a cash price of $8,014.52, and an amount financed of $7,084.27. It is undisputed that this contract discloses a total sale price of $12,223.40 and a finance charge of $3,139.13. It is undisputed that plaintiff Arlesia Frelix entered into a contract with Nelson Mazda for the purchase of a used, 1997 Ford Expedition on or about June 1, 1999 with an APR of 13.25% and an amount financed of $26,230.72. It is undisputed that this contract discloses a finance charge of $9,991.28. It is undisputed that plaintiff Valerie McSterling entered into a contract with Nelson Mazda for the purchase of a used 1997 Mercury Mountaineer on or about August 16, 1999 with an APR of 16.75% and an amount financed of $26,322.60. It is undisputed that this contract discloses a finance charge of $12,984.60. PRIMUS asserts that it was assigned each of these contracts, which plaintiffs dispute.

Plaintiffs filed suit in this court on behalf of themselves and all others similarly situated on April 16, 2002, alleging that defendants' credit pricing system has a discriminatory impact on African–American financing applicants, in violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.* (Docket No. 1.) Subsequently, defendant PRIMUS Auto-

motive Financial Services filed a Motion to Dismiss plaintiffs Claybrooks and Gooch (Docket No. 9), which was denied (Docket No. 33), as was a Motion to Reconsider the court's order (Docket No. 50). Plaintiffs filed a Motion to Dismiss Defendant's Counterclaims (Docket No. 38), which was denied as premature. (Docket No. 50.) PRIMUS Automotive Financial Services filed a Motion for Judgment on the Pleadings (Docket No. 53), which was denied. (Docket No. 67.) On September 17, 2002, defendant PRIMUS Financial Services was added by consent order. (Docket No. 62.) On November 1, 2002, plaintiffs filed the First Amended Class Action Complaint (Docket No. 69). PRIMUS sought to file an interlocutory appeal (Docket No. 70), which the court denied. (Docket No. 85.)

The court granted a stay pending trial in the case of *Cason v. Nissan Motor Acceptance Corporation* (Docket No. 73) but lifted the stay when a settlement was reached in that matter prior to trial. (Docket No. 76.) The plaintiffs filed a Second Amended Class Action Complaint on June 5, 2003. (Docket No. 84.) Defendants then filed a Motion to Compel Arbitration of plaintiff Barbara Trujillo's claims (Docket No. 92), which, after Trujillo was granted voluntary dismissal of her claim (Docket No. 100), the court denied as moot. (Docket No. 101.) Plaintiffs then filed the Third Amended Class Action Complaint. (Docket No. 105.) Subsequently, plaintiff Blanche Roland was voluntarily dismissed. (Docket No. 116.) Plaintiffs then filed a Fourth Amended Class Action Complaint (Docket No. 144), to which defendants filed an Answer and Counterclaim. (Docket No. 147.) Plaintiffs Grace Borlay, Petri Spivey, and Tabitha Holland have also been voluntarily dismissed. (Docket No. 153.)

The parties have engaged in mediation on a number of occasions throughout this litigation, but it has not resulted in settlement. This matter is presently before the court on defendants' Motion for Summary Judgment as to four of the six remaining named plaintiffs—Claybrooks, Gooch, Frelix, and McSterling. (Docket No. 153.) The court has certified this matter as a class action under Rule 23(b)(2) contemporaneously with this Motion.

### *Discussion*

#### I. *Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). If the nonmoving party, however, fails to make a sufficient

showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.,* 187 F.3d 533, 537–38 (6th Cir.1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon,* 107 F.3d 1171, 1174–75 (6th Cir.1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Shah v. Racetrac Petroleum Co.,* 338 F.3d 557, 566 (6th Cir.2003) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id.* at 255, 106 S.Ct. 2505.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505). "There is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Tinsley v. General Motors Corp.,* 227 F.3d 700, 703 (6th Cir.2000). If the

evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White,* 190 F.3d 427, 430 (6th Cir.1999) (citations omitted).

## II. *Analysis*

The defendants seek summary judgment as to the four identified plaintiffs because they argue that plaintiffs' claims are time-barred. ECOA mandates a two-year statute of limitations for private civil actions, measured from the date of the occurrence of the violation. 15 U.S.C. § 1691e(f) (2004). Defendants assert that the two-year statute of limitations began to run when each of the four plaintiffs signed his or her retail installment contract which, in each case, was more than two years prior to the filing of the Complaint on April 16, 2002. Plaintiffs make a number of arguments as to why their claims are not time-barred. The court considers these arguments in turn.[2]

### A. *Discovery Rule*

■ The plaintiffs assert that ECOA's two-year statute of limitations should be no bar to their claim because of the federal discovery rule which, they argue, provides that the statute of limitations begins to run when the plaintiffs knew or should have known both of their injury and of the cause of their injury. (Docket No. 175 at 13.) The defendants counter that a recent decision of the Supreme Court has called

---

**2.** Plaintiffs' argument that statutes of limitation cannot be applied to actions for injunctive relief and that, because it is undisputed

that plaintiffs have Article III standing, their claims are not barred, is without merit.

into question the continuing applicability of a general discovery rule for federal statutes and that, in any event, the Sixth Circuit has explicitly found that the statute of limitations for ECOA actions begins to run when the discriminatory act occurs, not when the effects of that act became painful. (Docket No. 156 at 12, 14.)

The court has previously considered this issue in ruling on defendants' Motion to Dismiss but deemed it unnecessary to address the question, based on its finding that allegations of a continuing violation and of fraudulent concealment were sufficient to toll the statute of limitations. (Docket No. 33 at 15.) The court now addresses the question on the merits and finds that, especially in light of the recent decisions of the Supreme Court and the Sixth Circuit, a discovery rule should not operate to make timely plaintiffs' time-barred claims.

In *TRW, Inc. v. Andrews,* the Supreme Court considered whether a discovery rule should govern claims under the Fair Credit Reporting Act ("FCRA"). *TRW, Inc. v. Andrews,* 534 U.S. 19, 23, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). The plaintiff in *TRW* had been the victim of identity theft facilitated by disclosures of TRW, a credit reporting agency, made at the thief's behest. The plaintiff did not realize that TRW had made such disclosures until several months later, when she sought to refinance her home mortgage, and did not file suit until more than two years after the first disclosures. TRW argued that her claim under the FCRA was time-barred in view of the statutory limitation that such actions were to be brought "within two years from the date on which the liability arises," and because the exception—which allows tolling of the statute of limitations, when a defendant has made a material misrepresentation, until a plaintiff has discovered the misrepresentation—was not implicated. *Id.* at 28, 122 S.Ct. 441. The

Court of Appeals for the Ninth Circuit had ruled that the claim was not time-barred because the court recognized a general discovery rule that was to be read into all federal statutes of limitations unless Congress had expressly legislated otherwise.

The Supreme Court found it unnecessary to resolve the question of whether such a general discovery rule should be read into all federal statutes of limitations. The Court did observe that the only cases in which it had explicitly recognized a discovery rule were those in which there was fraud or concealment, where equity tolls the statute of limitations, and those involving latent disease and medical malpractice, where such a rule is most pertinent. The tendency of lower federal courts to apply a general discovery rule when a statute was silent on when the limitations period begins to run had been observed by the Supreme Court in prior precedent, but not explicitly adopted by the Court as its own position. With respect to the FCRA, the Court found that no general discovery rule should be implied, because the text and structure of the statute evinced Congress's intent to preclude a judicial interpretation that would infer such a rule. As stated above, the FCRA contained an explicit, limited exception counseling that a plaintiff's later discovery of a material misrepresentation could toll the statute of limitations; therefore, to imply an additional, general discovery rule would not only supplement this explicit exception but also render it superfluous. In addition, the Court observed that the FCRA "does not govern an area of law that cries out for application of a discovery rule" and that the statute was not silent on when the limitations period begins to run. *Id.* at 28, 122 S.Ct. 441. Justice Scalia, concurring in the judgment, characterized the idea of a general discovery rule as "bad wine of recent vintage" and stated that the Court should have taken the opportunity to re-

state the traditional rule that "absent other indication, a statute of limitations begins to run at the time the plaintiff has the right to apply to the court for relief." *Id.* at 37, 122 S.Ct. 441 (Scalia, J., concurring) (internal quotations omitted).

Although the Supreme Court declined to rule on whether the lower courts' presumption of a general, federal discovery rule is proper, the Court's approach to this question in the context of FCRA informs this court's analysis of whether such a discovery rule should be implied in the context of ECOA claims. ECOA provides for a two-year statute of limitations, measured from the date of the occurrence of the ECOA violation.[3] It is not silent on when the statute of limitations begins to run, stating that it should run from "the date of the occurrence of the violation." 15 U.S.C. § 1691e(f) (2004). Moreover, the Sixth Circuit has explicitly stated that the limitations period begins to run at the time the discriminatory conduct occurs, not at the time that the consequences of the action becomes painful. *Mays v. Buckeye Rural Elec. Coop., Inc.*, 277 F.3d 873, 879 (6th Cir.2002).

In *Mays,* the defendant electrical utility required the plaintiff to apply, along with her husband, for electrical service in his name. Over a decade later, after the two had divorced, the defendant refused her individual application for electrical service until she had satisfied an outstanding balance incurred in her husband's name. The plaintiff claimed credit discrimination in violation of ECOA on the basis of her marital status. The defendant argued that this claim was time-barred, since the allegedly discriminatory action took place over a decade before, when she was made to sign the initial credit application with her husband. The Court agreed with the defendant. Relying on the decisions of other state and federal courts construing the ECOA's limitations period, the Court stated that the proper focus was on the discriminatory conduct giving rise to the ECOA claim, not on the timing of the decision's painful effects. In the plaintiff's case, the discriminatory conduct at issue was the requirement that she sign the original credit application along with her husband. Therefore, her claim should have been filed within two years of that conduct, a period which had long since passed.

Although *Mays* was decided after *TRW,* the application of a federal discovery rule was not at issue in the Sixth Circuit's decision. Nevertheless, *Mays* reveals the Sixth Circuit rule, derived from the language of the statute and from other courts' interpretation of that language, that accrual of the two-year limitations period begins when the discriminatory conduct occurs. Lower courts in the Sixth Circuit have relied on *Mays* for this rule, although they have not considered the applicability of the discovery rule to the ECOA post-*TRW.* *See, e.g., Mills v. Equicredit Corp.,* 294 F.Supp.2d 903, 909 (E.D.Mich.2003) (relying on *Mays* and finding that the limita-

---

**3.** The relevant text is as follows:

No such action shall be brought later than two years from the date of the occurrence of the violation, except that—
(1) whenever any agency having responsibility for administrative enforcement under section 1691c of this title commences an enforcement proceeding within two years from the date of the occurrence of the violation,

(2) whenever the Attorney General commences a civil action under this section within two years from the date of the occurrence of the violation,
then any applicant who has been a victim of the discrimination which is the subject of such proceeding or civil action may bring an action under this section not later than one year after the commencement of that proceeding or action.
15 U.S.C. § 1691e(f) (2004).

tions period for plaintiffs' ECOA claim, including an assertion of disparate impact, started to run when they signed loan documents and that no misrepresentation had been made that might have tolled the statute of limitations). As in *TRW*, the ECOA contains an express exception to the limitations period which provides that when the administrative agency in charge of enforcement of the ECOA brings an administrative proceeding or the Attorney General brings a civil enforcement action within two years of an ECOA violation, a private plaintiff who has been the victim of the discrimination that is the subject of such an administrative or civil action has one year from the commencement of that action to bring her own claim. 15 U.S.C. § 1691e(f). The plaintiffs argue that this exception is not analogous to the FCRA exception that convinced the *TRW* court that a discovery rule should not be implied because the ECOA exception "is completely unrelated to the discovery rule" while the FCRA provision was by its own terms a discovery rule replacing (and limiting) the general discovery rule. Because, according to the plaintiffs, the ECOA exception is not itself a discovery rule, judicial implication of a general discovery rule would not render the exception superfluous, as would have been the case had the *TRW* court reached a different result.

This court disagrees, and finds that the language of the statute and the apparent intent of Congress in amending 15 U.S.C. § 1691e(f) preclude application of a general discovery rule. The statute states that the limitations period should be measured from the date of occurrence of the violation. The legislative history, as discussed by the First Circuit Court of Appeals in *Farrell v. Bank of New Hampshire–Portsmouth,* suggests that Congress already considered the difficulty of discovering ECOA violations when, in 1976, it extended the limitations period from one to two years and added the explicit exception.

*Farrell v. Bank of New Hampshire–Portsmouth,* 929 F.2d 871, 874 (1st Cir.1991). In *Farrell,* a case relied on by the Sixth Circuit in *Mays,* the Court considered whether the ECOA statute of limitations began to run when the defendant bank communicated its discriminatory requirement that the plaintiffs' spouses guarantee their husbands' loans or when the plaintiffs actually signed papers complying with the discriminatory requirement. The court did not find an answer in the statutory language, which refers broadly to the "date of the occurrence of the violation," but found the legislative history to be helpful. The Senate report accompanying the 1976 amendments to the ECOA (which enlarged the limitation period to two years and added the exception for administrative or Attorney General actions) explained the amendments as follows, in relevant part:

> The Committee also recommends a change in the statute of limitations applicable to actions brought under this Act. The present one-year limitation is, we believe, too short a period of time for violations of antidiscrimination legislation. *The development and investigation of the necessary facts*—especially in the case of agency or Attorney General actions—*may require more than a year. Discriminatory practices, unlike violations of Truth in Lending, are not apparent from the face of particular documents or contracts. The Committee therefore recommends that the statute of limitations be extended to two years.* In addition, where an agency or [A]ttorney General action has been commenced within two years of a violation, and *where it is likely that individual applicants may only learn of potential violations through publicity surrounding the government's action, we believe the affected applicant should have a reasonable additional time to bring his or her private action.* The bill therefore per-

mits private actions to be brought within one year after the commencement of a government action where both involve the same conduct.

*Farrell,* 929 F.2d at 874 (quoting S.Rep. No. 94–589, at 14 (1976), *reprinted in* 1976 U.S.C.C.A.N. 403, 416) (emphasis added). Against this backdrop, the *Farrell* court found that the statute of limitations should run from the time the defendant communicated the discriminatory requirement. It declined to imply a requirement of notice to the individual claimant before the statute of limitations should run, because to do so would be to "disregard[ ] the way in which the Congress sought to accommodate aggrieved individuals—by doubling the general limitations period and by providing an additional year following the commencement of timely government enforcement proceedings or civil actions." *Id.*

This court agrees that, by extending the statute of limitations and allowing for the exception, Congress already purposefully modified the law to make allowances for the difficulty of plaintiffs' discovering ECOA violations. Thus, to imply a general discovery rule, in addition to these allowances explicitly made to address just such a problem, the court would be acting contrary to apparent Congressional intent. The court declines to do so. Finally, the concerns addressed by ECOA have more in common with concerns addressed by FCRA than with the medical, health, and well-being concerns of medical malpractice

and latent defects; thus, as the Supreme Court observed of FCRA, the ECOA "does not govern an area of the law that cries out for application of a discovery rule." *TRW,* 534 U.S. at 28, 122 S.Ct. 441. For these reasons, the court declines to imply a general discovery rule as part of the ECOA.[4]

## B. *Fraudulent Concealment*

 Plaintiffs also argue that ECOA's two-year statute of limitations should be no bar because defendants engaged in active, fraudulent concealment of the existence and amount of the mark-up. (Docket No. 175 at 21.) "The application of equitable principles is warranted when a defendant fraudulently conceals its actions, misleading a plaintiff respecting the plaintiff's cause of action." *Hill v. United States Dep't of Labor,* 65 F.3d 1331, 1335 (6th Cir.1995). To avoid the bar of a statute of limitations, a plaintiff must prove: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Id.; see also Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975). The plaintiff has the burden to prove the elements of fraudulent concealment. *Pinney Dock & Transp. Co. v. Penn Central Corp.,* 838 F.2d 1445, 1465 (6th Cir.1988). The Sixth

---

**4.** The plaintiffs urge the court to follow Judge Campbell's unpublished ruling on a Motion to Dismiss in *Coleman v. Gen. Motors Acceptance Corp.,* No. 3–98–0211 (M.D.Tenn. Nov. 10, 1998), in which he applied the discovery rule to the plaintiffs' ECOA claim. Because Judge Campbell's decision was rendered prior to, and without the benefit of, the guiding authority of both *TRW* and *Mays,* the court declines to do so. In addition, the court is cognizant of the fact that one district court has applied the federal discovery rule to toll

the statute of limitations on an ECOA claim after *TRW* and has distinguished the Supreme Court's treatment of FCRA from its treatment of ECOA because FCRA contained a specific, limited discovery rule which it determined that ECOA did not. *See Wise v. Union Acceptance Corp.,* No. IP 02–0104–C–M/S, 2002 WL 31730920, at *5 n. 2 (S.D.Ind. Nov. 19, 2002). However, for the reasons discussed above, the court declines to follow this unpublished, nonbinding authority.

Circuit has stated that equitable tolling is to be narrowly applied, given the value realized from the right to be free from stale claims. *Id.*

The court has considered the parties' fraudulent concealment arguments at an earlier stage in this litigation. In denying the defendants' Motion to Dismiss, the court found that fraudulent concealment by failure to disclose requires proof that the defendants had a duty to disclose the information in question and that the plaintiffs had failed to allege any specific facts upon which to base a duty to disclose by defendants. (Docket No. 33 at 13–14.) However, the court also found that the plaintiffs' claim of fraudulent concealment was not dependent on allegations of fraud by omission, but that the plaintiffs had also alleged affirmative misrepresentations by the defendants regarding the components of the finance charge, through deceptive and misleading representations in the financing documents created by the defendants. These allegations satisfied the plaintiffs' burden as to the first element of fraudulent concealment for purposes of that earlier motion, and plaintiffs also sufficiently alleged facts to satisfy the remaining elements of the test.

■ The parties' focus continues to be on the first element of fraudulent concealment. The plaintiffs assert that the evidence they have adduced satisfies their burden with respect to the present motion—that they have not only sufficiently alleged affirmative misrepresentations by the defendants, but that they have garnered "substantial evidence to support such allegations." (Docket No. 175 at 18.) However, much of the evidence they cite is a mere recasting of the defendants' failure to disclose the existence or amount of the markup. For instance, the plaintiffs cite as evidence of an affirmative misrepresentation PRIMUS's admission that it does not inform customers of the presence or amount of the markup. (Docket No. 175 at 18.) They also cite the fact that none of the required documents disclose the buy rate, the markup, or the existence of the markup policy, nor do the documents reveal the dealer's active role in setting the interest rate. *Id.* The only specific piece of evidence that they cite as an affirmative misrepresentation is that the PRIMUS credit application form, which was executed by Claybrooks, Gooch, Frelix, and Sterling, contains the PRIMUS name (or the name of one of its advertising labels) and states directly above the customer's signature line, in part: "For the purpose of securing credit from you [PRIMUS], I certify that the above information is true and complete to the best of my knowledge." Presumably, the plaintiffs believe that this acknowledgement that the applicant is seeking to secure credit from PRIMUS, in combination with the lack of any expression of the dealer's role in the transaction, conveys the impression to the applicant that PRIMUS is offering competitive rates, set entirely by PRIMUS, and based entirely on objective criteria. (Docket No. 175 at 19.)

The plaintiffs argue that these documents convey the message to each customer that she is obtaining a finance rate based on her individual and objective credit risk assessment, and never discloses that there is an entirely subjective component to the interest rate that varies among applicants or that PRIMUS provides financial incentives to dealers to subjectively increase the Contract APR. They argue that, to the extent the defendants dispute the "level of activeness of its misrepresentations," this is a dispute of material fact. (Docket No. 175 at 20.)

The court disagrees and finds that the plaintiffs have failed to adduce evidence of an affirmative misrepresentation sufficient to bar the effect of the statute of limita-

tions. It is undisputed that the plaintiffs did not speak to anyone from PRIMUS at the time that they completed their respective transactions at the dealerships. (Docket No. 176 ¶¶ 14–15, 23, 31.) It is undisputed that the plaintiffs were shown no PRIMUS-created documents, other than a credit application form, a retail installment contract form, an agreement to provide insurance form, and a notice to co-signor form. *Id.* at ¶¶ 6, 7, 18, 26. It is undisputed that, of these forms, there were no misrepresentations on the agreement to provide insurance forms signed by Claybrooks and Gooch, Frelix, and McSterling respectively, or on the notice to co-signor forms signed by Claybrooks and McSterling respectively. *Id.* at ¶¶ 10, 11, 21, 29, 30. The plaintiffs only assert that there were misrepresentations on the credit application forms and the retail installment contract forms signed by the plaintiffs. *Id.* at ¶¶ 8, 9, 19, 20, 27, 28. Further, the only misrepresentations alleged to be made on the retail installment contract forms concern PRIMUS's failure to disclose the markup policy, the dealer's role in setting the interest rate, and the fact of the inclusion of subjective charges—i.e., not any affirmative falsity but a silence about the structure of the arrangement. *Id.* at ¶¶ 9, 20, 28. The court has already concluded that such omissions are not sufficient to satisfy the first element of the fraudulent concealment test.

Therefore, the only affirmative misrepresentation upon which the plaintiffs can rely is the statement in the plaintiffs' respective credit applications that, "For the purpose of securing credit from you, I certify that the above information is true and complete to the best of my knowledge." In combination with the failure of the credit application to disclose that the dealer played any role in setting the interest rate, the plaintiffs assert that this statement is a misrepresentation of PRI-

MUS's relationship with the plaintiffs. *Id.* at ¶¶ 8, 19, 27. As a matter of law, this evidence is not sufficient to constitute an affirmative misrepresentation of the type necessary to satisfy the first element of the fraudulent concealment test. This statement primarily concerns the obligation of the signor to complete the form truthfully. It impliedly refers to the fact that PRIMUS is the entity providing credit, by stating that credit is secured from "you" (implying that "you" is PRIMUS). This statement, and the impression created by it, only indirectly concern who set the customer's interest rate and does not affirmatively mislead the customers into thinking that the rate is purely objective or purely set by PRIMUS. In fact it has little to do with the setting of the rate. Thus, the plaintiffs have failed to raise a genuine issue of material fact that the defendants engaged in wrongful concealment of facts underlying the plaintiffs' cause of action by making an affirmative misrepresentation as to PRIMUS's role in their credit transactions.

The court is guided in this conclusion by the Sixth Circuit's decision in *Pinney Dock*, in which the court considered whether the defendants in an antitrust action had fraudulently concealed plaintiffs' causes of action. *Pinney Dock*, 838 F.2d at 1465. At that point, the Sixth Circuit had not yet conclusively stated whether the element of wrongful concealment required proof of affirmative acts. After an in-depth analysis of the lower court's decision, and the authority on which it relied, the court concluded that a plaintiff should be required to prove affirmative acts of concealment except in cases founded on fraud or breach of fiduciary duty. The court relied on the case of *Ingram Corp. v. J. Ray McDermott & Co.*, 1980 WL 1819, 1980–1 Trade Cas. (CCH) ¶ 63,277 (E.D.La. Jan. 10, 1980), *rev'd on other grounds*, 698 F.2d 1295 (5th Cir.1983), to

help elucidate what kind of acts constitute affirmative concealment. In *Ingram*, the court determined that clandestine meetings at which bid-rigging was discussed did not constitute acts of affirmative concealment of a conspiracy, but that acts such as submitting prearranged losing bids by companies that had agreed not to take awards and positioning equipment in certain localities did constitute acts of concealment. These latter acts created the false impression that bids were competitively made, rather than rigged, and constituted affirmative acts of deception. The *Pinney Dock* court was guided by this analysis in concluding that letters and correspondence by the defendants contained "seeds of support" for the district court's finding that there was a factual question of actual concealment (although it ultimately concluded that the plaintiffs had not exercised due diligence in attempting to discover the facts of the alleged conspiracy). The plaintiffs appear to suggest that, by requiring the credit applicants to sign a form that identified the creditor as PRIMUS and by failing to reveal the dealer's role in setting the interest rate, the defendants acted affirmatively to create the false impression that the interest rate had been determined objectively and by PRIMUS alone. Relative to the acts of the defendants in *Ingram*, the defendants' actions do not rise to this level and do not lead necessarily to such a conclusion.

For these reasons, plaintiffs have failed to carry their burden to show fraudulent concealment.

## C. *Continuing Violation*

█ Finally, the plaintiffs argue that the two-year statute of limitations should be no bar to plaintiffs' claims because the plaintiffs allege a continuing violation under what the Sixth Circuit has deemed the second category of continuing violations— that which exists when a plaintiff has demonstrated a longstanding and over-arching policy of discrimination. (Docket No. 175 at 9.) They state that, to satisfy this category of the continuing violation doctrine, a plaintiff need only establish that an unlawful discriminatory practice is continuing and that one act of discrimination as a result of that practice occurred within the statute of limitations, but need not show that the act was perpetrated against the plaintiff specifically. The defendants counter that a plaintiff cannot satisfy the continuing violations doctrine on the basis of violations committed, under an ongoing policy of discrimination, against others. (Docket No. 156 at 6.) The court has previously weighed this argument in considering defendants' Motion to Dismiss and found in favor of the plaintiffs. Nevertheless, in response to defendants' Motion for Reconsideration, the court agreed that defendants' argument against plaintiffs' position was not without merit and could be renewed on Motion for Summary Judgment. (Docket No. 50 at 2 n. 1.) Thus, the only question at issue with respect to continuing violations in the present Motion is whether the plaintiffs have shown a continuing violation under the second category of that doctrine.

█ The continuing violation doctrine may operate to toll a statute of limitations in what the Sixth Circuit previously characterized as two categories of "narrowly limited exceptions," *Dixon v. Anderson,* 928 F.2d 212, 216 (6th Cir.1991) (quoting *E.E.O.C. v. Penton Indus. Pub. Co.,* 851 F.2d 835, 837–38 (6th Cir.1988)), i.e., "where the plaintiff can show prior discriminatory activity that continues into the present, as opposed to prior discriminatory activity whose effects continue into the present, and where the plaintiff can show a longstanding and demonstrable policy of discrimination." *Bell v. Ohio State Univ.,* 351 F.3d 240, 247 (6th Cir.2003) (internal citations and quotations omitted). In *AM-*

*TRAK v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court abrogated the first category of continuing violations and held that "while the continuing violation doctrine applies in hostile environment Title VII discrimination actions, it does not permit recovery for discrete acts of discrimination that occurred outside the statutory period." *Id.* (citing *Morgan,* 536 U.S. at 113, 122 S.Ct. 2061). The Sixth Circuit has observed that "the second category of continuing violations, involving a longstanding and demonstrable policy of discrimination, is not implicated by *Morgan.*" *Sharpe v. Cureton,* 319 F.3d 259, 268 (6th Cir.2003). The Sixth Circuit has not addressed the applicability of the continuing violations doctrine to claims under the ECOA, although it has observed that courts have been reluctant to apply the continuing violation doctrine outside of the context of Title VII. *See LRL Props. v. Portage Metro Housing Auth.,* 55 F.3d 1097, 1105 n. 3 (6th Cir. 1995). Other courts have considered the applicability of the continuing violation doctrine to ECOA claims. *See, e.g., Haynie v. Veneman,* 272 F.Supp.2d 10, 16–17 (D.D.C.2003); *Lewis v. Glickman,* 104 F.Supp.2d 1311, 1320–21 (D.Kan.2000).

In ruling on defendants' Motion to Dismiss, this court perceived a conflict between the Sixth Circuit's articulation of the second category of continuing violations and the Supreme Court's discussion of the doctrine in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Reasoning that, when applying an equitable doctrine of federal common law, the court was bound to follow Supreme Court precedent over conflicting decisions of the Sixth Circuit, the court followed *Havens Realty* and found that, as long as one claim of discriminatory action against any of the plaintiffs under an ongoing policy of discrimination fell within the limitations period (which it had in this case), then the claims of all members of the class who were injured by that policy would be allowed to proceed. (Docket No. 33 at 11.) In reviewing the parties' arguments on summary judgment and revisiting the relevant (and additional) authority, the court has concluded that the better view is that there is no conflict between *Havens Realty* and the Sixth Circuit's articulation of the rule.

*Havens Realty* presented a case with three individual plaintiffs. Paul Coles was an African–American who sought to rent an apartment from Havens Realty and was falsely told that no apartments were available. Sylvia Coleman, who was African–American, and R. Kent Willis, who was white, also inquired into the availability of apartments as "testers"; Coleman was told that none was available, and Willis was told that there were vacancies. Only Coles had made his inquiry within the statutory limitations period. Coles claimed that he had been injured in violation of the Fair Housing Act both by being denied the right to rent property and by being denied the benefits of interracial association from living in an integrated community. Coleman claimed that she had been injured both by being denied the benefits of interracial association and by being given misinformation concerning the availability of apartments. Willis claimed he had been injured by being denied the benefits of interracial association. In considering the petitioner's argument that respondents' claims were time-barred, the Court found that the denial of housing to Coles within the limitations period, pursuant to a continuing policy and practice of unlawful racial steering that foreclosed interracial association, rendered the "neighborhood" claims, based on the deprivation of interracial association, timely as to all plaintiffs under the continuing violations doctrine.

A close reading of *Havens Realty* reveals that, because of the nature of the neighborhood claims in *Havens Realty*, the denial of housing to an African–American (Coles) stated an injury as to all those who sought to benefit from interracial association. Thus, the denial of housing to Coles *did* cause a specific injury to both Coleman and Willis within the limitations period, independent of any interaction they might have had with Havens Realty, because the rejection of Coles deprived them of the benefits of interracial association. Coleman and Willis could show both an ongoing policy of discrimination and an injury to themselves during the limitations period.[5] In this way, *Havens Realty* is not in conflict with Sixth Circuit precedent, which requires that, to invoke the second category of the continuing violation doctrine, a plaintiff must show both a continuing, over-arching policy of discrimination and a specific discriminatory act against the plaintiff within the limitations period. *See Dixon*, 928 F.2d at 217 ("[W]ithout a specific, allegedly discriminatory act against [the plaintiffs] within the limitations period, mere existence of an alleged policy violating equal protection rights will not toll the running of the statute of limitations."); *Blevins v. General Electric Co.*, 995 F.2d 1066, 1993 WL 188381, at *3 (6th Cir.1993) (approving the district court's reliance on *Dixon* as establishing this requirement); *see also Conlin v. Blanchard*, 890 F.2d 811, 815 (6th Cir.1989) (finding no continuing violation because discriminatory acts against plaintiffs fell outside of limitations period and other discriminatory acts were unavailing because "these alleged acts were directed at other people").

The plaintiffs rely on *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 408–09 (6th Cir.1999), in which the Sixth Circuit concluded that the plaintiffs had sufficiently alleged a continuing violation under both categories of the continuing violation doctrine to toll the limitations period with respect to their claims of disparate impact and disparate treatment under Title VII and 42 U.S.C. § 1981. The plaintiffs observe that the *Alexander* court did not require the members of the plaintiff class to show that they had continued to apply for and been denied union membership into the limitations period in order to invoke the continuing violation doctrine. The court agrees that the Sixth Circuit in *Alexander* did not stringently consider whether each of the plaintiffs had been subjected to an act of discrimination within the limitations period; rather, it found with respect to the second category of continuing violations that a policy and practice of excluding African–American applicants existed and "continued into the relevant limitations period." *Id.* at 408. In a footnote, the Court draws attention to

---

5. The defendants urge that this interpretation of *Havens Realty* is the only one consistent with the Supreme Court's treatment of Coleman's tester claim, which it found was time-barred and not subject to the continuing violations doctrine. (Docket No. 156 at 9.) The Court said that:

> We do not agree ... that insofar as respondent Coleman has standing to assert a claim as a "tester," she may take advantage of the "continuing violation" theory. Her tester claim is, in essence, that on four isolated occasions she received false information from petitioners in violation of [the FHA]. It is not alleged, nor could it be, that

the incident of steering involving Coles ... deprived Coleman of her [FHA] right to truthful housing information.

*Havens Realty*, 455 U.S. at 381, 102 S.Ct. 1114. Although, as the defendants suggest, it is a plausible reading of this passage that Coleman could not prove a continuing violation because she could only show an injury to another person during the limitations period, it is not the only plausible reading. For instance, another plausible reading is that the character of her claims—"four isolated occasions"—does not demonstrate activity pursuant to a continuing policy of discrimination.

this point, observing that exact dates of the plaintiffs' exclusions had been difficult to ascertain from the record but that, as a whole, the district court had not been clearly erroneous in finding a continuing violation that continued into the limitations period. This court does not find that the decision in *Alexander* overcomes its obligation to follow the binding precedent of *Dixon*. Although it relied on *Dixon* for an articulation of the second category of continuing violations, *Alexander* did not import the *Dixon* court's requirement that the plaintiff show at least one discriminatory action within the limitations period pursuant to a longstanding, overarching policy of discrimination, which is a salient point of that decision. Thus, *Alexander* did not pointedly consider whether or not one additional act had to occur within the limitations period for the second category to apply, and if so, against whom this action had to have been taken. Moreover, the *Alexander* court was considering both categories of continuing violations at once and found that both had been invoked. This court is bound to follow *Dixon* which is prior, controlling authority on the exact point at issue in this case.

Finally, the court observes that this requirement that a plaintiff must show not only a longstanding, overarching policy of discrimination but also a specific, allegedly discriminatory act against her within the relevant limitations period has been favored by other circuit courts of appeal. *See, e.g., Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1221 (11th Cir.2001) ("We can find no authority, however, for allowing one plaintiff to revive a stale claim simply because the discriminatory policy still exists and is being enforced against others."); *Jenson v. Eveleth Taconite Co.,* 130 F.3d 1287, 1303 (8th Cir.1997) (requiring that plaintiff show an ongoing pattern or practice of discrimination and that any violation took place within the statutory period and analyzing whether such violation occurred with respect to the plaintiff herself during that period); *Miller v. Int'l Tel. & Tel. Corp.,* 755 F.2d 20, 25 (2d Cir.1985) ("[S]everal courts have held that an employee who has been discharged pursuant to a discriminatory policy may not take advantage of later discriminatory acts against other employees for the purpose of postponing the running of the statutory period as to him on a continuing violation theory.")

As defendants assert, the plaintiffs in this case allege that PRIMUS continued to take discriminatory action against third parties during the limitations period; however, plaintiffs are unable to allege that any of these transactions caused them harm, as Coleman and Willis in *Havens Realty* were able to. Plaintiffs' only claim of injury flows from their own transactions. Therefore, they are not able to make the required showing in order to invoke the second category of the continuing violation doctrine.

### Conclusion

For the reasons stated herein, the defendants' Motion will be granted.

An appropriate order will enter.